IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FRANKLIN C. BROWN, *et al.* :
:
v. : CIVIL NO. CCB-09-1684
:
NEUBERGER, QUINN, GIELEN, :
RUBIN & GIBBER, P.A., *et al*. :
...o0o...

**MEMORANDUM**

Plaintiffs Franklin S. Brown ("Mr. Brown") and Karen C. Brown ("Mrs. Brown" and collectively with Mr. Brown, the "Browns") have filed the present lawsuit against the law firm of Neuberger, Quinn, Gielen, Rubin & Gibber ("NQGRG"), individual attorneys Isaac M. Neuberger and Michael L. Quinn (collectively with NQGRG, the "NQGRG defendants"), and Martin Grass, former CEO of the Rite Aid Corporation ("Rite Aid").[1] The amended complaint (the "complaint") alleges seven causes of action relating to injuries the Browns sustained while having to defend against a 2005 civil lawsuit brought by Rite Aid (the "Rite Aid lawsuit").[2] Specifically, the Browns allege they were wrongly accused in the Rite Aid lawsuit as a result of the fraudulent actions of the defendants. Now pending are the defendants' motions to dismiss or, in the alternative, for summary judgment. The motions have been fully briefed and the court heard oral argument on June 18, 2010.[3] For the reasons set forth below, the defendants' motions

---

[1] The original complaint also named Robert C. Campbell as a defendant. He has since been dismissed from the lawsuit.

[2] Count I alleges breach of fiduciary duty against Martin Grass; Count II alleges breach of fiduciary duty against Defendants Neuberger, Quinn, and NQGRG; Count III alleges civil conspiracy against all defendants; Count IV alleges fraud against all defendants; Count V alleges constructive fraud against all defendants; Count VI alleges wrongful appropriation of name against all defendants; and Count VII alleges negligence against all defendants.

[3] The parties had already briefed motions to dismiss the original complaint before the

will be granted.

**BACKGROUND**

This lawsuit is the product of a series of unfortunate events at Rite Aid. At the time this suit was filed, both Mr. Brown and Martin Grass were serving time in federal prison for their criminal acts as Rite Aid executives.[4] The present allegations are based on the 1994 sale of a Rite Aid subsidiary, Sera-Tec Biologicals, Inc. ("Sera-Tec"), and the subsequent Rite Aid lawsuit against Mr. Brown and Martin Grass, among others, for their allegedly fraudulent acts associated with the Sera-Tec sale.

*I.     The Sera-Tec Sale*

Rite Aid became a publicly-traded company in 1968. Mr. Brown was the General Counsel of Rite Aid from 1968 to 2000, and had been the personal friend of and attorney for Alex Grass, Rite Aid's founder, since 1954. Mr. Brown continued to work for Rite Aid even after Martin Grass, the son of Alex Grass, was promoted from President of Rite Aid to CEO and Chairman of the Board in 1995.

Rite Aid acquired Sera-Tec as a subsidiary in 1970; by 1990 Rite Aid owned all of Sera-Tec's stock through a holding company called Life-Aid Services, Inc. ("Life-Aid"). Also through Life-Aid, Rite Aid owned minority shares in two additional companies: Immucor Corp. and Isolyser, Inc. (the "Investment Securities").

As part of a national expansion effort, Rite Aid decided to divest Sera-Tec, along with other non-core businesses, in 1994. Alex Grass decided that he wanted to purchase Sera-Tec from Rite Aid and, with the assistance of NQGRG, formed a company called A.G. Capital, Inc.

---

Browns amended their complaint. Accordingly, the parties have incorporated their initial papers into their present briefs.

[4]     The transactions at issue in the criminal cases against Mr. Brown and Martin Grass are not directly at issue in the present matter.

2

("A.G. Capital") for the purpose of bidding on Sera-Tec.  The complaint alleges that in 1994 either A.G. Capital was owned in significant part by the Alexander Grass Descendants' Trust (the "Trust"), or the Trust received significant assets from A.G. Capital.  Alex Grass and Mr. Brown were excluded from all internal Rite Aid meetings regarding the sale of Sera-Tec because they were insiders of publicly-traded Rite Aid.  The Browns allege that Martin Grass did not disclose his interest in any companies planning to bid on Sera-Tec and therefore was not excluded.  A Special Committee was formed to handle the sale.

After an auction, A.G. Capital was deemed the successful bidder, and a stock purchase agreement was prepared on July 11, 1994.  This agreement set forth the assets that were to be sold from Rite Aid to A.G. Capital.  The Investment Securities were not part of the sale, and bidders had not included the value of those securities in their bids.  The crux of the Browns' complaint is that Martin Grass, or someone acting on his behalf, copied Mr. Brown's and Alex Grass's signatures without their knowledge onto false documents related to the sale of Sera-Tec in order to secretly transfer the Investment Securities to A.G. Capital, and to make it look as though they were part of the sale all along.  In short, Martin Grass is alleged to have transferred the Investment Securities to A.G. Capital without paying for them, using Mr. Brown's name and position to give the false documents credibility.  The complaint alleges that the defendants placed fraudulently created documents purporting to bear Mr. Brown's and Alex Grass's signatures into a secret file at Rite Aid (the "Secret File").  These documents included a revised disclosure statement and delivery confirmations.

The closing for the Sera-Tec sale occurred on October 7, 1994 at the law offices of NQGRG in Baltimore, Maryland.  Mr. Brown did not attend the closing, allegedly because Martin Grass informed him that his services were not needed.  On March 5, 1995, Martin Grass

succeeded his father as CEO and Chairman of the Board of Rite Aid. The complaint alleges that Martin Grass, with the assistance of the NQGRG defendants, subsequently created a series of shell companies to hold the Investment Securities and then sell them for a total of $30 million. The ill-gotten gains were allegedly deposited into the Trust. According to the Browns, Mr. Brown had no reason to suspect the scheme because of his exclusion from the Sera-Tec deal.

## II.     *The Rite Aid Lawsuit*

Mr. Brown retired from Rite Aid in 2000, and in 2001 Mrs. Brown became Trustee of the Trust. Then, according to the complaint, years after Mr. Brown's retirement, Rite Aid and/or federal law enforcement personnel discovered the Secret File created by Martin Grass and the NQGRG defendants. The Browns allege that, as a result, on September 12, 2005, Rite Aid named Mr. Brown, Alex Grass, Martin Grass, and Mrs. Brown as Trustee as defendants in a civil lawsuit filed in Dauphin County, Pennsylvania. The lawsuit alleged that Alex and Martin Grass fraudulently converted the Investment Securities, and that Mr. Brown aided and abetted them by retaining the Secret File. The Browns allege, however, that Mr. Brown's only connection to the Secret File was his misappropriated signature on the fraudulent disclosure statement and delivery certificates. The Browns further allege that at the time the Rite Aid lawsuit was filed, Mr. Brown was unaware that Martin Grass and the NQGRG defendants had forged his signature.

According to the Browns, in order to keep them from discovering the misappropriation of Mr. Brown's signatures, Mr. Neuberger contacted Mrs. Brown and offered to represent her and her husband in the Rite Aid lawsuit. The representation of the Browns by NQGRG was to be paid for in full by Alex and Martin Grass, and the Browns allege they were told that they only would have to pay for local counsel. The Browns claim they agreed to Mr. Neuberger's offer because they had worked with NQGRG in the past and trusted the firm. But they also claim that

NQGRG restricted the flow of information to them in order to cover up the fraudulent Sera-Tec sale. In addition, the Browns allege that Martin Grass and the NQGRG defendants further concealed their fraud by removing Mrs. Brown as Trustee in the fall of 2005. The NQGRG defendants, on the other hand, argue that they never represented the Browns in the Rite Aid lawsuit. They contend instead that Jack J. Bernstein served as the Browns' attorney at all times during the Rite Aid lawsuit in Pennsylvania.

On March 16, 2006, following objections to venue in Pennsylvania, Rite Aid filed a second, almost identical, lawsuit in New York. After the second suit was filed, the Browns elected to have Amy Adelson and Daniela Klare-Elliot of Dershowitz, Eiger & Adelson represent them, since the firm was already representing Mr. Brown in his criminal appeal. The Rite Aid lawsuit was ultimately dismissed as time-barred, but the Browns allege they incurred expenses in excess of $100,000 in defending the suit. They filed the present lawsuit on June 25, 2009 in order to recoup those expenses.

The defendants have moved to dismiss the complaint or, in the alternative, for summary judgment on the grounds that the Browns' claims are time-barred under the applicable three-year statute of limitations. They also argue that the Browns are judicially estopped from bringing this action. For the following reasons, the defendants' motions will be granted.

## ANALYSIS

I.  *Standard of Review*

"[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks and alterations omitted) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir.

1999)). When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir.1997). To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and alterations omitted). Thus, the plaintiff's obligation is to set forth sufficiently the "grounds of his entitlement to relief," offering more than "labels and conclusions." *Id.* (internal quotation marks and alterations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1950 (2009) (quoting Fed. R. Civ. P. 8(a)(2))

Where, as in this case, materials outside the pleadings are proffered by the parties and relied on by the court, the motion may be converted to one for summary judgment. *See* Fed. R. Civ. P. 12(b); *Gadsby by Gadsby v. Grasmick,* 109 F.3d 940, 949 (4th Cir. 1997); *Paukstis v. Kenwood Golf & Country Club, Inc.,* 241 F. Supp. 2d 551, 556 (D. Md. 2003). The parties, however, must be provided with notice that a Rule 12(b)(6) motion may be treated as a motion for summary judgment, which can be satisfied when a party is "aware that material outside the pleadings is before the court." *Gay v. Wall,* 761 F.2d 175, 177 (4th Cir. 1985); *see also Laughlin v. Metro. Washington Airports Auth.,* 149 F.3d 253, 261 (4th Cir. 1998) (commenting that a court has no obligation "to notify parties of the obvious"). In this case, the Browns were on notice and attached documents to their responses. Accordingly, the court will treat the defendants' motions as ones for summary judgment.

Federal Rule of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

II.     *Statute of Limitations*

The parties agree that Maryland law applies in this diversity case, and that the applicable statute of limitations is three years. *See* Md. Code, Cts. & Jud. Proc. § 5-101. Under the discovery rule in Maryland, a plaintiff's cause of action accrues when the plaintiff knows or

7

reasonably should have known of the wrong. *See Lumsden v. Design Tech Builders, Inc.*, 749 A.2d 796, 801 (Md. 2000) (citing *Poffenberger v. Risser*, 431 A.2d 677, 680 (Md. 1981)). The discovery rule is "premised on discovery of the harm," and the aggrieved party need "not be aware of the extent of the harm, the source, or other intimate details of the tort." *Dual Inc. v. Lockheed Martin Corp.*, 857 A.2d 1095, 1104 (Md. 2004).

"A claimant reasonably should know of a wrong if the claimant has 'knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus, charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.'" *Lumsden*, 749 A.2d at 801 (alterations in original) (quoting *Poffenberger*, 431 A.2d at 681). In other words, when a "claimant gains knowledge sufficient to put her on inquiry" she is charged, as of that date, "with knowledge of facts that would have been disclosed by a reasonably diligent investigation", *id.* (quoting *O'Hara v. Kovens*, 503 A.2d 1313 (Md. 1986)), regardless of whether such an investigation was conducted or was successful. *See id.* at 805. Thus, "the beginning of limitations is not postponed until the end of an additional period deemed reasonable for making the investigation", rather, the statute itself allows time for diligent inquiry. *Id.* at 801 (citing *O'Hara*, 503 A.2d 1313).

The question of accrual is left to judicial determination. *Frederick Road Ltd. P'ship v. Brown & Sturm*, 756 A.2d 963, 973 (Md. 2000). If there is a genuine dispute of material fact as to when the plaintiff was on inquiry notice, summary judgment is inappropriate. *Bank of New York v. Sheff*, 854 A.2d 1269, 1275 (Md. 2004). But if there is no such genuine dispute, and "the question of whether the plaintiffs were on inquiry notice more than three years before their suit was filed can be determined as a matter of law, summary judgment on that issue is, indeed, appropriate." *Id.* Here, summary judgment is appropriate because the court finds as a matter of

law that the Browns were on inquiry notice prior to June 25, 2006, three years before this case was filed.

The first issue is raised by the "Slaughter Affidavit." Although the parties agree that the Browns were on inquiry notice when they received the Slaughter Affidavit as part of Rite Aid's opposition memorandum in the Rite Aid lawsuit, they disagree as to the date the Browns actually received it. Attached to the Slaughter Affidavit were the allegedly fraudulent signature pages from the Secret File; while the Browns argue they received it on June 26, 2006, the defendants contend they did so on June 22, 2006. Once the Browns obtained the Slaughter Affidavit, they hired another attorney, Stephen Nudel, to investigate. They allege that only upon Mr. Nudel's investigation did they discover the true nature of the defendants' fraudulent acts.

The date the Browns received the Slaughter Affidavit is not dispositive, however, because it is clear from the record that the Browns were on inquiry notice well before June 2006. Rather, they were on notice at least by September 12, 2005, when Rite Aid filed its lawsuit in Pennsylvania. Rite Aid's complaint alleged, among other things, that the defendants:

> affirmatively concealed their scheme through the creation of two separate Disclosure Schedules purporting to describe the assets of Sera-Tec included in the Sera-Tec transaction. One disclosure statement, created for public consumption, excluded any mention of Isolyser or Immucor. The other disclosure statement, maintained exclusively in Franklin Brown's personal files, contained a schedule of 'miscellaneous assets' which included as 'investment securities' of Sera-Tec plaintiffs' shares of Isolyser and Immucor.

(*See* Rite Aid Complaint, attached to Grass Initial Mem. as Ex. 5, at ¶ 25(e)). Thus, as the Browns acknowledge, receipt of Rite Aid's complaint put them on notice that they were being accused of misconduct in relation to the Sera-Tec sale. (*See* Pls.' Initial Opp'n Mem. at 18.) The Browns argue, however, that it was not until they received the Slaughter Affidavit that they began to realize exactly *how* they were implicated and therefore began to investigate. But this

9

argument is unavailing. *See Lumsden*, 749 A.2d at 805 (explaining that "a statute of limitations generally is not delayed by any period of investigation to ascertain the precise cause of the injury").

The Rite Aid lawsuit plainly informed the Browns that (1) they were implicated in a civil lawsuit, and (2) Mr. Brown was accused of having retained false documents related to the Sera-Tec sale. Ordinary prudent people convinced of their innocence would have investigated immediately upon receiving such a complaint, and a reasonably diligent investigation would have discovered what the Browns' ultimate investigation apparently did: that Mr. Brown's signature had been forged as part of a fraudulent transfer of the Investment Securities.

That the Rite Aid complaint did not specifically mention Mr. Brown's purported signature on the fraudulent Sera-Tec documents is not dispositive; significantly, during a 2004 proffer session with federal investigators, Mr. Brown was shown a signature page from a document related to the Sera-Tec transaction that bore his signature, but that he did not recall signing. (Franklin Brown Aff., attached to Pls.' Initial Opp'n Mem. as Ex. 1, at ¶ 29.) The Browns contend that at the time of the proffer session Mr. Brown did not know that his signature was forged, and could not have understood the significance of the document, because although he was largely excluded from the Sera-Tec transaction, he still signed ministerial documents concerning the transaction, and therefore did not perceive that the document shown to him was false. (*See id*.) The Browns argue that, on its own, the document shown to Mr. Brown was not sufficient to put a person of ordinary prudence on inquiry notice. But the court need not decide whether Mr. Brown was on inquiry notice as of the 2004 proffer session because, by the time the Rite Aid complaint was filed in September 2005, the Browns possessed information which, when considered in addition to that disclosed in the proffer session, was more than sufficient to cause

people of ordinary prudence to be suspicious and investigate.[5]

Upon the filing of the Rite Aid complaint, the Browns knew they had been accused of fraud and of harboring secret false documents, and Mr. Brown had already had occasion to have seen one such document. The Browns were, therefore, on inquiry notice as a matter of law by September 2005, regardless of whether they knew precisely how the alleged fraud had been executed or who had implicated them. *See Lumsden*, 749 A.2d at 805 (holding the plaintiffs' breach of implied warranty claim was time-barred because the limitations period was triggered when they noticed a defect in their driveway, not months later when they discovered who was responsible).

## III. Equitable Tolling

The Browns argue, however, that the statute of limitations should be tolled in this case until the date they received the Slaughter Affidavit because (1) they had an attorney-client relationship with the NQGRG defendants and (2) the defendants fraudulently concealed their causes of action. According to the defendants, these theories of equitable tolling are inapplicable, because an exercise of due diligence is still required, and the Browns were imprudent by failing to investigate even after they were named as defendants in the Rite Aid lawsuit. The court agrees with the defendants.

### A. Continuation of Events and Confidential Relationship

In Maryland, under the "continuation of events theory", a statute of limitations may be tolled during the existence of a fiduciary or confidential relationship.[6] *MacBride v. Pishvaian*,

---

[5] Indeed the Browns' counsel agreed at oral argument that the lawsuit put his clients on inquiry notice.

[6] The Browns describe the continuation of events theory and the confidential relationship theory as two separate grounds for tolling the statute of limitations. Even if the theories are conceptually different, however, the analysis is the same in this case.

11

937 A.2d 233, 239 (Md. 2007); *Dual*, 857 A.2d at 1107. The reasoning behind the theory is that a relationship built on trust "generally gives the confiding party the right to relax his or her guard and rely on the good faith of the other party so long as the relationship continues to exist." *MacBride,* 937 A.2d at 240 (internal quotation marks omitted) (quoting *Frederick Road*, 756 A.2d at 975). But "mere conclusory allegations of a fiduciary relationship are insufficient to support application of the continuation of events theory." *Id*. Rather, specific facts supporting such a relationship must be shown. *Id*. Furthermore, the statute of limitations will not be tolled where a "party had knowledge of facts that would lead a reasonable person to undertake an investigation that, with reasonable diligence, would have revealed the wrongdoing on the part of the fiduciary." *Id*. (internal quotation marks omitted) (quoting *Dual*, 857 A.2d at 1108).

The parties dispute whether an attorney-client relationship existed between the NQGRG defendants and the Browns during the Rite Aid lawsuit. But even assuming an attorney-client relationship existed, that relationship is not sufficient to toll the statute of limitations in this case because it was formed *after* the Browns were on inquiry notice. The Browns allege that an attorney-client relationship was formed only after Rite Aid filed suit. By that time, the Browns already had knowledge of facts that would have led a reasonable person to undertake an investigation.

The Browns ask the court to adopt a novel version of the continuing events theory in which the limitations period would be tolled simply because the Browns hired attorneys after they were on inquiry notice, causing them to subsequently relax their vigilance against those attorneys. But such a holding would be inconsistent with the discovery rule and a misapplication of the continuing events theory. Rather, time for diligent inquiry is built into the statute of limitations and the discovery rule. *See Lumsden*, 749 A.2d at 801. From the time the Browns

received Rite Aid's complaint in September 2005, they had a full three years to investigate their suspicions and file suit. The beginning of the limitations period is not postponed until the end of a plaintiff's investigation, *see id.*, nor will it be tolled simply because a plaintiff's investigation is allegedly thwarted by the initiation of an attorney-client relationship after the plaintiff had knowledge of facts that should have led him to be suspicious. *See Frederick Road*, 756 A.2d at 975 (explaining that a confidential relationship tolls the limitations period only where there is nothing to put the plaintiff on inquiry and where the injured party has exercised due diligence).

The defendants argue that there was no attorney-client relationship between the Browns and NQGRG. This dispute need not be resolved, because the Browns' claims accrued when they received the Rite Aid complaint in September 2005. Whether or not an attorney-client relationship was formed thereafter, the Browns' claims are not subject to equitable tolling under the continuing events theory.[7]

B.   *Fraudulent Concealment*

The Browns also argue that the statute of limitations should be tolled as a result of the defendants' fraudulent acts. By statute in Maryland, the fraud of an adverse party may postpone the accrual of a cause of action. Md. Code Ann., Cts. & Jud. Proc. § 5-203. It is not required that the "defendant commit a fraud distinct from that initially committed for the purpose of keeping the plaintiff in ignorance of his or her cause of action." *Frederick Road*, 756 A.2d at

---

[7]   The Browns also argue that although Martin Grass was not in a fiduciary relationship with them, he was a co-conspirator with the NQGRG defendants and, therefore, the statute of limitations should be tolled as to him as well. The cases cited by the Browns for this proposition, however, do not support their contention. *See Daugherty v. Kessler*, 286 A.2d 95, 101 (Md. 1972) (dealing only with the admissibility of declarations of one co-conspirator as those of another co-conspirator); *Compass Marketing, Inc. v. Schering-Plough Corp.*, 438 F. Supp. 2d 592, 595 (D. Md. 2006) (stating simply that the underlying acts of one co-conspirator are attributable to another co-conspirator). Thus, even if the statute were tolled as to the NQGRG defendants, it would not have been tolled as to Martin Grass.

13

975. Rather, § 5-203 applies where two conditions are met: "(1) the plaintiff has been kept in ignorance of the cause of action by the adverse party, and (2) the plaintiff has exercised usual or ordinary diligence for the discovery and protection of his or her rights." *Id*. Generally, non-disclosure does not constitute fraud unless there is a duty to disclose. *Id*. at 976 n.14. Thus, absent a fiduciary relationship, to establish fraudulent concealment a plaintiff must demonstrate that the defendant took an affirmative action to conceal the cause of action. *Id*.

In this case, however, the Browns' failure to exercise diligence in the face of facts that raised suspicion also makes the fraudulent concealment theory of equitable tolling inapplicable. The Browns argue that allegedly fraudulent acts such as NQGRG's offer to represent them, Martin Grass's removal of Mrs. Brown as trustee, and the defendants' unauthorized use of Mr. Brown's signature, concealed their causes of action. But the fraudulent concealment theory of equitable tolling applies only where the plaintiffs have exercised ordinary diligence for the discovery and protection of their rights. Here, as a result of the September 2005 Rite Aid complaint and the 2004 proffer session, the Browns already had knowledge of (1) their implication in fraud concerning the Sera-Tec transaction, (2) a signature page that Mr. Brown did not recall signing, and (3) their economic injury in having to defend themselves, *before* Mrs. Brown was removed as Trustee and the NQGRG defendants allegedly offered to represent the Browns. Thus, the Browns failed to exercise ordinary diligence by not investigating once they were aware of these facts.

There is no basis, therefore, for equitable tolling in this case. Accordingly, because the Browns were on inquiry notice as of September 2005, when the Rite Aid complaint was served, their present claims are time-barred and the defendants are entitled to summary judgment.[8]

---

[8] Because the Browns' complaint is time-barred as a matter of law, the court need not

## **CONCLUSION**

For the reasons stated above, the defendants' motions to dismiss or for summary judgment, treated as motions for summary judgment, will be granted. A separate Order follows.

    August 2, 2010                                       /s/
        Date                                               Catherine C. Blake
                                                            United States District Judge

---

address the defendants' judicial estoppel argument.